Filed 5/7/21  In re A.C. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D078335 |
| Plaintiff and Respondent, | (Super. Ct. No. EJ4033B) |
| v. | |
| B.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

1

B.C. (Mother) appeals an order in the Welfare and Institutions Code section 300[1] dependency proceedings of her son, A.C., in which the juvenile court found at the 12-month review hearing that it would be detrimental to return him to her care and ordered that her visitation with him be supervised. On appeal, Mother contends: (1) there is insufficient evidence to support the court's finding that there would be a substantial risk of detriment to her son's physical or emotional well-being if he were returned to her care; and (2) the court abused its discretion by requiring her visitation with him to be supervised. Based on our reasoning below, we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND[2]

Mother and D.F. (Father) have long histories of substance abuse. Mother began using methamphetamine and heroin about 17 years ago and Father began using methamphetamine and marijuana about 36 years ago. In 2016, after Mother tested positive for drugs three times during her pregnancy with her first child and the child tested positive for methamphetamine and marijuana at birth, the child was removed from her care. Ultimately, the juvenile court awarded the child's father, T.D., full physical custody and granted Mother short, unsupervised visits.

In September 2017, A.C., Mother's second child, was born. Both Mother and A.C. tested negative for drugs at his birth. In April 2019, T.D.

---

[1]     All statutory references are to the Welfare and Institutions Code.

[2]     For a more detailed description of the early factual background in this case, refer to *In re A.C.* (Mar. 11, 2020, D076666) [nonpub. opn.] (*In re A.C. I*), our prior opinion in this dependency case.

reported to the Agency that he had seen Father smoking methamphetamine in the home while A.C. was present. He also reported seeing a marijuana pipe on a table that was accessible to A.C. T.D. was also concerned that Mother had relapsed into drug use. T.D. thereafter reported to the Agency that in May 2019 Mother admitted to him that she had relapsed and he had seen methamphetamine in her purse. Mother and Father agreed to a drug test requested by the Agency, but neither appeared at the testing facility on that day.

In June 2019, the Agency served Mother and Father with a warrant to search the home and take A.C. to the Chadwick Center at Rady Children's Hospital for a neglect exam. Mother admitted using methamphetamine and heroin in the past, but asserted she had completed the McAlister treatment program in September 2017 and had been clean since A.C.'s birth. Mother arrived at the Chadwick Center about 30 to 45 minutes late. She displayed erratic behavior and was pacing, sweating, moving up and down in her chair in a hyperkinetic fashion, answering questions in a sing-song voice, and speaking in a pressured manner. She stated at one point, "I'm tripping." Both the physician and nurse believed Mother should not be permitted to take A.C. home with her.

When the nurse began to prepare A.C. for a urine collection, Mother stated that she had left her keys in the ignition, ran out of the room, and returned shortly thereafter. The Agency social worker called police, who responded and concluded Mother was not under the influence. Nevertheless, the physician believed that Mother's behavior was "very concerning" for substance abuse, such as methamphetamine, and return of A.C. to her would put him at risk for injury. The following day, T.D. reported to the Agency that Mother had purchased clean urine and used a bottle of it to fill the test

3

sample for A.C. during his exam.  When the Agency social worker asked the nurse about A.C.'s urine test, the nurse confirmed she had turned her back and that Mother had returned from her car and was "messing with" A.C.'s diaper and then stated "oh he did it" after urinating.  The urine sample tested negative for drugs.

A couple of days later, Mother submitted to a drug test that the Agency requested and the test result was positive for methamphetamine and marijuana.  Mother then admitted she had used methamphetamine a couple of times to stay awake for night shifts at work.  She denied tampering with A.C.'s urine for his recent test.

In July 2019, the Agency filed the instant juvenile dependency petition on behalf of A.C., alleging that he was at risk of suffering serious physical harm or illness as a result of his parents' inability to care for him due to their substance abuse.  At his detention hearing, the court detained A.C. outside of the home.  Later that month, neither Mother nor Father submitted to a drug test as the Agency requested.  Mother enrolled in a drug treatment program and participated regularly.  In September, Mother submitted to a drug test requested by the Agency and the result was negative.

At the September 2019 contested jurisdiction and disposition hearing, the court acknowledged Mother's and Father's participation in treatment, but nevertheless found that, given their lengthy histories of addiction, recent admissions of relapse, and missed drug tests, they were not secure in their sobriety and posed a risk to A.C.'s safety if he were returned to their care.  In particular, the court stated:  "There is evidence of concerning, bizarre behavior by [Mother] which is best explained by methamphetamine use."  Accordingly, the court found it had jurisdiction over A.C. pursuant to section

300, subdivision (b), declared him a dependent of the court, and found his removal from their care was necessary. The court ordered reunification services for Mother and Father, approved the Agency's case plans for them, ordered them to comply with those services, and advised them that their failure to cooperate with the services provided in their case plans could result in termination of reunification efforts and termination of their parental rights. In particular, Mother's case plan required her to "submit to on-demand drug testing via hair follicle or urinalysis when requested by the Agency." Her case plan also required her to participate in individual counseling with a TERM-approved therapist and, if requested by her therapist, participate in a psychological evaluation. On appeal, in *In re A.C. I*, we affirmed the jurisdictional and dispositional order, concluding there was substantial evidence to support the court's findings. (*In re A.C. I*, *supra*, at pp. 12-16, 19-21.)

In its March 2020 six-month review hearing report, the Agency stated that Mother had a history of being uncooperative. Although she had tested positive at the outset of A.C.'s case, Mother had since completed a substance abuse program, regularly visited A.C., and made progress in her reunification services. She was identifying her relapse triggers, which included T.D., the father of her oldest child. She stated she had been "clean" since July 2019. Mother had completed a parenting course and participated in 10 therapy sessions since August 2019. Based on Mother's progress, she had recently progressed to unsupervised visitation with A.C. However, she had only one unsupervised visit before supervised visits were reinstated after she allowed T.D. to accompany her while visiting A.C. The contested six-month review hearing was continued due to the COVID-19 pandemic and set to be heard concurrently with the 12-month review hearing in September 2020.

In its September 12-month review hearing report, the Agency stated that it had received a referral reporting that Mother had threatened to kill Father. Mother reportedly entered his residence while he was visiting with A.C. Mother was reportedly "high as a kite" and A.C. screamed when he saw her. The referral was later closed as inconclusive for neglect.

Although T.D. was a trigger for Mother, she traveled to Chicago to visit him. In June, Mother refused her therapist's recommendation that she submit to a psychological evaluation due to behavioral changes her therapist had observed. Since early July, Mother had missed all of her therapy sessions and declined her therapist's offer for telephonic sessions while Mother was in Chicago. In August, her therapist spoke with her and then reported to the Agency that Mother seemed "a little drifty" and was "all over the place" and that she feared Mother had relapsed.

Mother was not compliant with the Agency's requests for drug testing. The Agency reported that although Mother stated she had tested twice, it had received only one drug test result from a May test, which result was negative. The Agency further stated that in May Mother did not submit to drug testing on the day and at the site it requested, claiming it had not given her enough time. Instead, Mother went to her own testing site three days later and submitted that one negative test. In July, Mother again did not submit to drug testing requested by the Agency, asserting she had been in an automobile accident. The Agency's social worker was able to speak with Mother's sponsor just once in May and her messages to the sponsor thereafter were unreturned. The Agency concluded that it would be detrimental for A.C. to be returned to his parents' care because, among other things: (1) Mother had not shown over a period of time that she could create for him a safe, supportive environment, which was free of the effects of substance

6

abuse; (2) Mother had not yet shown she could take care of herself and maintain a clean, sober environment; (3) it was unclear whether Mother was using substances at that time because her last test result the Agency had received was from May; and (4) Mother had not yet completed the psychological evaluation requested by her therapist. The Agency stated that Mother was unwilling to submit to its requested drug tests. Accordingly, the Agency recommended that the court find that the return of A.C. to his parents would create a substantial risk of detriment to him, continue his foster care placement, order an additional six months of reunification services for Mother and Father, and require that Mother's visits with A.C. be supervised.

In its November addendum report, the Agency stated that Mother had refused to submit to drug tests at its approved sites. The Agency stated that since November 2019 when Mother completed the McAlister substance abuse treatment program, she had not consistently tested as requested by the Agency and it questioned her sobriety over the past year. The Agency further stated that Mother sent its social worker a text message in August cancelling her visit with A.C. that day because she was ill. However, when the social worker spoke with A.C.'s foster mother, the foster mother reported that Mother was not ill but was instead in Chicago at that time. In early October, the Agency requested that Mother submit to drug testing by the next day. When the Agency social worker spoke with Mother the next day, Mother, speaking erratically and in a rambling manner, stated she was on her way to the drug testing facility. Mother also stated she obtained a rental in Chicago for $500 per month and had made an appointment for a psychological evaluation in a few days. She also asserted she did not have a photo identification card and had traveled to and from Chicago by plane without an

7

identification card.  Later, Mother called the social worker and informed her she could not complete the requested hair follicle test that day.  Mother nevertheless agreed to provide the test facility with a urine sample, but left the facility without doing so.  When the social worker subsequently questioned Mother about her missed drug test, Mother asserted the test facility worker had sent her to an urgent care clinic for her test.  Mother stated she would provide the social worker with test results from the urgent care clinic.

The foster mother reported that during a recent visit with A.C., Mother told her she was going to obtain a gel to place in her hair so that she could pass the hair follicle test.  Mother also told her that she and T.D. were engaged to be married in Chicago in March 2021.

In late October 2020, Mother made excuses regarding why she could not test at the site requested by the Agency social worker and stated she would get a drug test on her own.  She later sent the social worker a receipt from a laboratory, which receipt indicated that the "donor provided insufficient amount."  The social worker spoke with the psychologist who was assigned to conduct Mother's psychological evaluation and learned that she was having difficulty scheduling it because Mother was in Chicago.

In early November, the Agency social worker attempted to verify a drug test result submitted by Mother.  The laboratory confirmed the test result was valid, but indicated the hair follicle testing was done in Ohio even though Mother probably did not have it collected there.  When the social worker asked Mother to submit to a drug test, Mother stated she had missed her flight home.  Mother stated she would provide the social worker with some drug test results that she obtained on her own.  The Agency attached to

its addendum various drug test results submitted by Mother from local urgent care clinics. Mother also submitted results from a urine test that did not test for methamphetamine or other drugs she had used in the past and showed its collection site as being in San Antonio. She provided the Agency with signatures showing her attendance at 12-step meetings from mid-July through early August and mid-September through mid-October, but no proof of attendance thereafter. She submitted a note from her sponsor, stating Mother was a good person who should have her child back and was working on step nine, but omitting any information regarding how long Mother had been clean and sober.

The Agency opposed unsupervised visits between Mother and A.C. It stated that Mother needed to consistently comply with reunification services and make behavioral changes before her visits could be unsupervised. It believed Mother was a flight risk and, when out of state, could have video or phone visits with him. Nevertheless, Mother had not taken advantage of that alternative form of visitation. The Agency also believed that Mother could be using false identification. Although Father had made progress and was working on his sobriety, Mother had not made the changes necessary to reunify with A.C. or to have unsupervised visits. Accordingly, the Agency recommended that the court order additional reunification services for Mother and Father.

At the contested November 2020 12-month review hearing, the court admitted in evidence the Agency's reports and heard testimony from Mother and two Agency social workers. The first social worker, Nicole M., testified that she was assigned as A.C.'s case worker from November 2019 through March 2020 and thereafter had supervised the social worker assigned to the case. In March 2020, Mother appeared to be doing well and the Agency had

9

recommended that she have unsupervised visits. However, Mother's visits soon reverted back to supervised visits after she invited T.D., with whom she had a history of violence, to her visit with A.C. During a July 2020 visit, the foster mother described Mother's behavior as erratic. Mother yelled at A.C. and had bruises between her toes, which possibly were track marks and indicative of drug use. Mother ended a subsequent visit early, stating she had to fly back to Chicago to be with T.D. Nicole M. testified that Mother's credibility was in question in that she had been dishonest with the Agency in the past. She was concerned that Mother may have relapsed into drug use. Also, A.C. appeared fearful in reaction to Mother's yelling and erratic behavior.

Nicole M. testified that Mother's drug test in May 2020 at an urgent care clinic had not been approved by the Agency, which had requested testing at another facility. She testified that persons could be savvy and alter drug test results. Mother had not yet completed the psychological evaluation recommended by her therapist. Although Mother had described T.D. as dangerous, she continued to travel to Chicago to see him and her older son and told a social worker that she intended to marry T.D. Nicole M. testified that she was also concerned about Mother's statement that she did not have an identification card, which card is required to submit to drug testing at the Agency's facility. Mother had previously stated that she could pay someone to pass a drug test for her.

The second Agency social worker, Elizabeth W., testified that she had been assigned to A.C.'s case since August 2020. In early October, she had requested that Mother submit to a drug test at a certain facility, but Mother instead went to an urgent care clinic, falsely claiming she had been directed there by a worker at the first facility. Mother's visits with A.C. were not

regular and she had not visited him in person in the past month. Based on Mother's behavior, the foster mother reported that she was concerned Mother was possibly high. Elizabeth W. testified that when she interacted with Mother, Mother appeared very anxious, in a rush, and spoke in a repetitive manner, which, to her, indicated Mother was either having a type of mental health episode or had started using drugs again. She did not have confidence that Mother was clean and sober.

Mother testified that she had rented a room in a Lakeside residence for about five months and also obtained a residence in Chicago, near T.D. She testified that she had recently lost her identification card and currently had only a paper copy of it. She admitted she went to an urgent care clinic for the October 2020 drug test requested by the Agency social worker. She admitted she had not yet completed her psychological evaluation. She denied telling the foster mother that she knew people who worked at drug testing sites or that she planned to obtain a gel to place in her hair to pass a hair follicle test. She denied she was engaged to, or in a relationship with, T.D. She stated she had seen her therapist the week before the hearing.

When the court asked Mother why she had not submitted any proof of her attendance at Alcoholics Anonymous or Narcotics Anonymous meetings after late October, Mother replied with an expletive, indicating that she had forgotten to submit verification slips showing her attendance at recent meetings. The court admitted documentary evidence submitted by Mother, including 12-step meeting slips and therapy progress reports through July 2020. Over the Agency's objection, the court also admitted the results of a hair follicle test that purportedly showed Mother tested negative in October 2020.

11

After the evidentiary portion of the trial, the Agency argued that return of A.C. to his parents' care would be detrimental to him. Although Mother had done well during the first six months of reunification services, the Agency argued she had not done well since April 2020 and had not undergone drug testing at any Agency-approved facilities since May 2020. The Agency and Mother's providers were concerned that Mother may have relapsed into drug use. A.C.'s counsel joined with the Agency and argued that A.C. should continue to be placed in out-of-home care, and visits with him should continue to be supervised. Mother's counsel requested that A.C. be returned to Mother's care with family maintenance services. The court adopted the Agency's recommendations, found, by clear and convincing evidence, that return of A.C. to his parents would be detrimental, ordered an additional six months of reunification services, and ordered that Mother's visits be supervised. Mother timely filed a notice of appeal, challenging the court's 12-month review hearing order.

## DISCUSSION

### I

*Substantial Evidence Supports the Court's Detriment Finding*

Mother contends that there is insufficient evidence to support the court's finding, by clear and convincing evidence, that there was a substantial risk of detriment to A.C.'s physical or emotional well-being if he were to be returned her care.

### A

At the contested 12-month review hearing, the court found that Mother had made some progress toward alleviating or mitigating the causes that led

to A.C.'s dependency and foster care placement.  The court adopted the Agency's recommendations in its September report and found, in particular, it would be detrimental to place A.C. with either parent.  Regarding Mother, the court stated that she had started very strong, had embraced services, and appeared to be clean and sober, but "something has gone wrong since Spring.  Something is not quite right.  Her behavior has been erratic and bizarre according to multiple sources, including her therapist and this is indicative of either relapse, a substance abuse problem, or mental health problem, or both.  [¶]  Simply, her behavior is not the behavior of someone who is clean and sober and mentally well."  The court noted Mother's lack of cooperation in submitting to drug tests requested by the Agency at its approved sites.  It also noted Mother's failure to complete a psychological evaluation.  The court stated:  "[B]ecause she has not done those things, there are these unanswered questions about drug use and about mental stability and then those questions cast doubt on her claims about her plans for the future and about her relationship with [T.D.].  So, the foundation is just not there for us to be able to put [A.C.] with [Mother] today."  Accordingly, the court found, by clear and convincing evidence, that there was a substantial risk of detriment to A.C.'s physical or emotional well-being if he were returned to Mother's care.

B

"When the child is removed from the home, the court first attempts, for a specified period of time, to reunify the family."  (*In re Celine R.* (2003) 31 Cal.4th 45, 52.)  "Until permanency planning, reunification of parent and child is the law's paramount concern."  (*Judith P. v. Superior Court* (2002) 102 Cal.App.4th 535, 546.)  In particular, at a 12-month review hearing, a court must return the child to the parent's custody unless it "finds, by a preponderance of the evidence, that the return of the child to his or her

13

parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) On appeal, where a parent challenges a juvenile court's finding that return of the child to the parent's care would be detrimental to the child, an appellate court must determine whether there is substantial evidence to support that finding. (*V.C. v. Superior Court* (2010) 188 Cal.App.4th 521, 529.)

In determining whether there is substantial evidence to support a finding or order, "[w]e do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) The appellant challenging that finding bears the burden on appeal to show there is insufficient evidence to support the court's findings and orders. (*Ibid.*; *In re D.M.* (2012) 205 Cal.App.4th 283, 291.) In determining whether there is substantial evidence to support the court's finding by clear and convincing evidence, we determine whether the record as a whole contains "substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*In re Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

C

We initially address the Agency's motion to dismiss Mother's challenge to the court's detriment finding, which motion is based on her omission of adequate citations to the record in support of the factual assertions made in her opening brief. The Agency asks that we conclude her omission of

14

adequate citations to the record resulted in a waiver or forfeiture of her challenge to the detriment finding.

The Agency correctly notes that the California Rules of Court, rule 8.204(a)(1)(C)[3] requires that all briefs filed in an appeal "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." In the event a brief is accepted for filing despite noncompliance with that requirement, rule 8.204(e)(2) presents an appellate court with three options:

> "(A) Order the brief returned for corrections and refiling within a specified time;
>
> "(B) Strike the brief with leave to file a new brief within a specified time; or
>
> "(C) Disregard the noncompliance."

Although none of the above three options includes dismissal of an appeal, the Agency nevertheless asks us to exercise our inherent power to dismiss Mother's appeal of the detriment finding as a sanction for her noncompliance with rule 8.204(a)(1)(C). We decline to do so. First, Mother's opening brief omitted citations to the record in support of factual assertions made in about one and a half pages of her substantive argument challenging the detriment finding. However, Mother included citations to the record in her brief's combined statement of the case and facts that preceded her substantive argument, and those citations arguably provided support for some of the factual assertions made in her substantive argument. Second, Mother, in effect, cured any such deficiency by setting forth in her reply brief

---

[3]     All references to rules are to the California Rules of Court.

the original factual assertions in her opening brief *with the addition* of *citations to the record* in support thereof. Finally, even if a party omits citations to the record in support of factual assertions made in a brief, we independently review the record on appeal and therefore generally will not be misled by any inaccuracies in a parties' description of the underlying facts or evidence. To the extent a party misrepresents the facts or evidence in a case and/or omits citations to the record in support of factual assertions, those misrepresentations or omissions may affect our view of that party's contentions on appeal and undermine the persuasiveness of those contentions. Accordingly, we deny the Agency's motion to dismiss Mother's appeal in part.

D

Based on our review of the record, we conclude there is substantial evidence to support the court's finding, by clear and convincing evidence, that there would be a substantial risk of detriment to A.C.'s physical or emotional well-being if he were returned to Mother's care.[4] The record shows that both the Agency and the court were concerned that Mother had not adequately established that she had been consistently free of methamphetamine or other substance abuse for a sufficient time such that she no longer posed a substantial risk to A.C.'s physical or emotional well-being. As discussed above, Mother's case plan required her to "submit to on-demand drug testing

---

[4] Although section 366.21, subdivision (f)(1) required the court to make its detriment finding based only on a preponderance of the evidence, we nevertheless review the court's finding for substantial evidence to support it based on a clear and convincing standard of proof because that is the standard applied by the court. Any error by the court in applying that greater standard of proof would have been to Mother's benefit.

16

via hair follicle or urinalysis when requested by the Agency." Although Mother apparently complied with that requirement during the first six-month review period, the record shows that during the second six-month period that led up to the 12-month review hearing, she failed to promptly and consistently comply with the Agency's requests for drug testing and/or to submit to drug testing at its approved testing sites. In particular, as discussed above, Mother did not submit to drug testing requested by the Agency on the day in May and at the site it requested, claiming it had not given her enough time. Instead, she went to her own testing site three days later and submitted that negative test. In July, Mother did not submit to drug testing requested by the Agency, claiming she had been in an automobile accident. In early October, the Agency requested that Mother submit to drug testing by the next day. The next day, Mother spoke to the Agency social worker in an erratic and rambling manner and asserted she was on her way to the drug testing facility. She called the social worker later that day and informed her she could not complete the requested hair follicle test that day, but nevertheless agreed to provide the test facility with a urine sample. She subsequently left the test facility without doing so, falsely claiming that the facility worker had directed her instead to go to an urgent care clinic. In early November, Mother again did not submit to a drug test requested by the Agency, claiming she had missed her flight home from Chicago.

Regarding the test results submitted by Mother to the Agency from drug tests taken at facilities other than ones approved by the Agency, the Agency had difficulty confirming their validity and, in particular, whether Mother was, in fact, the person tested at that facility. One laboratory receipt submitted by Mother showed the donor had provided an insufficient amount.

17

Another laboratory test result submitted by Mother showed the hair follicle testing was done in Ohio even though Mother likely did not have it collected there.  Another test result submitted by Mother showed the urine sample was not tested for methamphetamine or other drugs she had used in the past and showed its collection site as being in San Antonio.  The record also supports a reasonable inference that Mother may have been savvy about drug testing procedures and knew ways to avoid a positive test.  In particular, the record supports an inference that in June 2019 Mother purchased a "clean" urine sample, which she covertly used as a substitute for the urine sample to be taken from A.C. at his Chadwick Center exam.  Subsequently, A.C.'s foster mother reported to the Agency that Mother told her she was going to obtain a gel to place in her hair so that she could pass the hair follicle test.  At the 12-month review hearing, Nicole M., the Agency social worker, testified that she was concerned about Mother's statement she did not have an identification card, which card is required to submit to drug testing at the Agency's facility, and that Mother had previously stated that she could pay someone to pass a drug test for her.  Therefore, the Agency and the court could reasonably doubt the validity of drug test results submitted by Mother from testing facilities she chose and not approved by the Agency.

Furthermore, there was ample additional evidence to support a reasonable inference by the Agency and the court that Mother had not, in fact, been clean and sober since July 2019 as she asserted.  The Agency received a referral (later found to be inconclusive for neglect) reporting that Mother entered Father's residence while he was visiting with A.C., was "high as a kite," and threatened to kill Father.  Also, Mother had missed all of her therapy sessions since early July 2020.  Her therapist reported to the Agency that when she spoke with Mother in August, she seemed "a little drifty" and

18

was "all over the place" and feared Mother had relapsed. Furthermore, the foster mother reported that Mother's behavior during a July 2020 visit with A.C. was erratic. Mother yelled at A.C. and had bruises between her toes, which possibly were track marks and indicative of drug use. Also, Mother missed her twice weekly in-person visits with A.C. for the entire month prior to the 12-month review hearing and did not call the foster mother to check on his welfare between visits. Although Mother submitted to the Agency a note from her sponsor, the sponsor omitted any information regarding how long, or how well, Mother had maintained her sobriety. Also, Mother submitted 12-step meeting attendance slips that showed irregular or intermittent attendance and, in particular, two month-long gaps in attendance. At the 12-month review hearing, Nicole M. testified that she was concerned that Mother may have relapsed into drug use and that A.C. appeared fearful in reaction to her yelling and erratic behavior. Also, Elizabeth W., the other Agency social worker, testified that when she interacted with Mother, she appeared very anxious, in a rush, and spoke in a repetitive manner, which, to her, indicated Mother was either having a type of mental health episode or had started using drugs again, and she did not have confidence that Mother was clean and sober.

In addition to Mother's inadequate compliance with her case plan's requirement that she submit to drug testing requested by the Agency, Mother also did not adequately comply with her case plan's requirement that she participate in therapy and obtain any psychological evaluation requested by her therapist. As noted above, Mother's therapist reported that Mother had not participated in sessions since early July 2020 and had not completed the psychological evaluation she had requested. Mother admitted at the 12-month hearing that she had not yet completed the psychological evaluation.

19

The court could reasonably infer that Mother's failures to regularly participate in her therapy sessions and to complete the psychological evaluation were consistent with her apparent relapse into drug abuse.

Based on the above evidence, the court could reasonably find that as of the time of the 12-month review hearing Mother had not yet overcome the problem that led to A.C.'s dependency (i.e., her methamphetamine abuse). Because the purpose of a reunification plan is to overcome the problem that led to a child's dependency (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483) and there is substantial evidence to support a finding that Mother had not been consistently free of methamphetamine or other substance abuse for a sufficient time, we conclude there is substantial evidence to support the court's finding that Mother had not yet overcome her substance abuse problem and its finding, by clear and convincing evidence, that she therefore posed a substantial risk of detriment to A.C.'s physical or emotional well-being.

To the extent Mother cites evidence or inferences therefrom that would have supported contrary findings by the court, she misconstrues and/or misapplies the substantial evidence standard of review. (*V.C. v. Superior Court*, *supra*, 188 Cal.App.4th at p. 529; *In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 947; *In re D.M.*, *supra*, 205 Cal.App.4th at p. 291.) Also, *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, cited by Mother, is factually inapposite to this case and does not persuade us to reach a contrary conclusion. Unlike Mother here, the parent in that case had successfully completed 84 of 95 scheduled drug tests over an 11-month period, only one of which was positive (for marijuana), and, based thereon, the appellate court concluded that parent had sufficiently complied with her case plan. (*Id.* at

p. 1343.)  The record here does not show any comparable frequent and consistent drug testing by Mother.

## II

### *The Court Did Not Abuse Its Discretion by Requiring Mother's Visits with A.C. to be Supervised*

Mother also contends the juvenile court abused its discretion by ordering that her visits with A.C. be supervised.

### A

Visitation, as frequent as possible, is a critical component of reunification.  (§ 362.1, subd. (a)(1)(A); *In re T.W.-1* (2017) 9 Cal.App.5th 339, 347; *In re T.G.* (2010) 188 Cal.App.4th 687, 696-697.)  The court may, however, limit a parent's contact with a child on finding such limitation is in the child's best interest.  (*In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1133.)  Because the juvenile court is given wide discretion in making visitation orders in the child's best interest, we apply the abuse of discretion standard in reviewing such orders.  (*In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1044; *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)  In reviewing a court's exercise of discretion, we do not reverse the order unless the court made an arbitrary, capricious, or patently absurd determination.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)  The appellant has the burden on appeal to show the court abused its discretion.  (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423.)

### B

Contrary to Mother's assertion, the court did not abuse its discretion by requiring that her visits with A.C. continue to be supervised.  In particular,

the court could rationally conclude that Mother's failure to overcome her substance abuse problem (as discussed in section I(D) above), inconsistent participation in therapy, and failure to complete a psychological evaluation showed that she was not yet in a position to be trusted to have unsupervised visits with A.C. Furthermore, the Agency believed that Mother posed a flight risk to A.C. in that there was evidence showing she had plans to marry, or at least continue her relationship with, T.D. and presumably live in the Chicago area. The record also shows that A.C. displayed behavioral problems after visits with Mother. His foster mother reported that he vomited after all of his visits with Mother.[5] In September 2020, Mother attended a visit with A.C. wearing the same clothes she had worn to his birthday party a few days earlier and was aggressive. In its November 2020 addendum report, the Agency opposed Mother's request for unsupervised visits, explaining that Mother's interactions with the Agency had been erratic and confusing and she had not been forthcoming with information for the Agency. Based on the record, we conclude the court acted within its reasonable discretion in ordering that Mother's visits with A.C. be supervised. To the extent Mother cites evidence and inferences that would have supported a contrary visitation order by the court, she misconstrues and/or misapplies the abuse of discretion

---

[5] We also note that A.C. has certain special needs that apparently had yet to be fully diagnosed at the time of the 12-month review hearing, which needs further support the court's implicit finding that unsupervised visits with Mother would not be in his best interest.

standard of review.  (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318; *In re Cliffton B.*, *supra*, 81 Cal.App.4th at p. 423.)

## DISPOSITION

The order is affirmed.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.